# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

SHANE T., by and through his
parent CATHY K.,

        Plaintiffs,                  **CIVIL ACTION NO. 3:16-0964**

        v.                      **(JUDGE MANNION)**

CARBONDALE AREA SCHOOL
DISTRICT,

        Defendant.

## MEMORANDUM

Before the court are a motion for summary judgment/judgment on the administrative record filed by the defendant Carbondale Area School District ("the District"), (Doc. 15), and a cross-motion for judgment on the administrative record filed by the plaintiffs, Shane T. (Shane) by and through his mother Cathy K. (Cathy), (Doc. 18), with Cathy also requesting relief in the form of private school tuition reimbursement. Shane is a special education student residing in the District and currently attending a private school in Scranton, Pennsylvania, Allied Services dePaul School ("Allied dePaul"). On July 1, 2015, the plaintiffs filed a due process complaint with Pennsylvania's Office for Dispute Resolution ("ODR") alleging that the District violated the Individuals with Disabilities Education Act ("IDEA"), 84 STAT. 175, as amended, 20 U.S.C. §1400 *et seq.* and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), as amended, 29 U.S.C. §701 *et seq.* because the District failed to offer Shane a free appropriate public education ("FAPE").

On February 23, 2016, after two days of hearings, an administrative Hearing Officer ordered the District to evaluate Shane, but denied the plaintiffs' request for tuition reimbursement and an independent educational evaluation ("IEE") at the District's expense. (Doc. 8-2). The plaintiffs' complaint, (Doc. 1), challenges this decision. In their current motions, the plaintiffs seek to reverse and the District seeks to uphold the Hearing Officer's determination. Based on the foregoing, the parties' motions will be **GRANTED IN PART** and **DENIED IN PART** and the case will be remanded to the Hearing Officer for further findings.

## I.    BACKGROUND[1]

Cathy has identified her son, Shane, as having learning disabilities and speech and language impairments, specifically, Attention Deficit Hyperactivity Disorder ("ADHD"), dysgraphia, and dyslexia. (Doc. 8-6 at 82). On September 12, 2013, Cathy re-enrolled Shane in the District while he was attending Allied dePaul, a private school that serves children with learning disabilities. Following Shane's re-enrollment, the District did not perform an evaluation of Shane or propose an individualized education program ("IEP") for him. The parties dispute whether the District's failure to act violated the IDEA.

---

[1] Unless otherwise noted, the court will look to the record for the facts. (Doc. 8). Notably, none of the underlying facts appear to be in dispute, though, as later explained in this memorandum, the parties do dispute a factual finding made by the Hearing Officer in his February 23, 2016 decision. (Doc. 8-2).

Shane was born on April 15, 2005. (Doc. 8-6 at 81). Prior to his kindergarten year, he attended a Head Start program and the District and he received early intervention services. (Doc. 8-4 at 13; Doc. 8-5 at 8, 42). On August 25, 2010, Cathy enrolled Shane in Fell Charter Elementary School ("Fell Charter"), a public charter school. (Doc. 8-5 at 8). On September 3, 2010, she formally withdrew Shane from the District so he could attend kindergarten at Fell Charter. (Doc. 8-5 at 6). According to Cathy's testimony at the administrative hearing, she withdrew Shane from the District because her "niece and nephews went to Fell Charter and they thrived there." (Doc. 8-4 at 19). At some point during his time at Fell Charter Shane was identified as having learning disabilities and an initial IEP was completed for him. According to Cathy's testimony, this initial IEP was done at her written request. (*Id.* at 16).

By February 24, 2011, Shane had a IEP Team in place at Fell Charter and a meeting was held to evaluate his special education needs into the following year. (Doc. 8-5 at 10–29). This initial IEP indicated that Shane had communication needs. In particular, he was identified as having difficulties with letters and numbers, consistent with his mother's testimony regarding Shane's dyslexia. (*Id.* at 13–15). It also indicated that he required specialized speech and language support at the charter school, in addition to program modifications incorporated into the general education learning environment. (*Id.* at 21). Shane attended Fell Charter for the entirety of his kindergarten year, the 2010 through 2011 school year. A reevaluation report was completed

on May 4, 2011 for the following school year. (*Id.* at 30–51). The reevaluation again classified Shane as having a health impairment and a speech and language impairment with the need for continued services. (*Id.* at 46).

Shane began the following school year, 2011 through 2012, at Fell Charter. According to Cathy's testimony, Fell Charter wanted Shane to repeat his kindergarten year. (Doc. 8-4 at 14). He only attended Fell Charter a couple of months out of the 2011 through 2012 school year, apparently completing the first trimester. (I*d.*; *see also* Doc. 8-5 at 52 (special education progress report completed by Fell Charter on November 3, 2011 )). As of November 3, 2011, Shane was showing progress in some, but not all of his IEP goals. (Doc. 8-5 at 53–57). Ultimately, Cathy withdrew Shane from Fell Charter and placed him in Allied dePaul to complete his first grade year. (Doc. 8-4 at 14). Cathy made the decision to send Shane to Allied dePaul was based upon a doctor's recommendation to her. (*Id.* at 19). The placement into Allied dePaul was supported by and paid for by Fell Charter. (*Id.*). Shane attended Allied dePaul for the remainder of his first grade year and second grade year, both paid for by Fell Charter. (*Id.* at 19; *see also* Doc. 8-6 at 97).

According to Cathy's testimony at the administrative hearing, around the time of the transition from Fell Charter to Allied dePaul, December of 2011, Cathy spoke to the former director of special education services for the District, Mary Ann Boyle, and had a few conversations with her about Shane. (Doc. 8-4 at 14–15). She testified that she called looking for information about possible

services for her son. (*Id.*). She also called other entities in an effort to get services for her son. (*Id.* at 14).[2] The record does not indicate exactly how many times Cathy contacted Mary Ann Boyle to discuss Shane during the 2011–2012 school year. By May of 2012, however, Mary Ann Boyle was replaced by a new special education director, Angela Geyer. (Doc. 8-4 at 7). Mrs. Geyer did not become aware of Shane until the 2013–2014 school year and Cathy did not speak to Mrs. Geyer before that time. (*Id.*; Doc. 8-4 at 22).

There is no evidence that the District offered a placement to Shane during his transition from Fell Charter to Allied dePaul. By November 30, 2011, however, an equitable participation/service plan was created for Shane by the Northeastern Educational Intermediate Unit 19 ("NEIU").[3] (Doc. 8-6 at 31). Thus, Shane did have a Service Plan Team in place at that time. Shane's November 30, 2011 service plan indicated that he was attending Allied dePaul and that his "District/School" was "Carbondale/Fell Charter." (*Id.*). Dr. Clarence Lamanna, the director of the NEIU, was designated as Shane's Local Education Agency ("LEA") Representative. (*Id.*; Doc. 8-4 at 11). The service plan indicated that Shane would require speech and language support and that

---

[2] The District has not offered any evidence to contradict Cathy's version of events during Shane's transition from Fell Charter to Allied dePaul or records of Mary Ann Boyle's communications with Cathy at that time. There is record of a December 13, 2011 fax transmittal from Allied dePaul to the District requesting Shane's information. (Doc. 8-5 at 69–70).

[3] The NEIU services special education students enrolled in private schools located in Northeastern Pennsylvania.

the intervention would take place at Allied dePaul until an anticipated end date of November 29, 2012. (Doc. 8-6 at 40). The service plan made clear that it was not an IEP. (*Id.* at 31).

Shane completed his first grade year at Allied dePaul without incident. He also attended Allied dePaul for his second grade year, 2012–2013, without incident. The NEIU updated Shane's service plan on May 9, 2013 for the 2013–2014 school year, his third grade year. (Doc. 8-6 at 64). His updated plan remained unchanged and indicated that Shane would continue to receive speech and language support at Allied dePaul through an anticipated end date of May 8, 2014. (*Id.* at 73).

On September 12, 2013, the beginning of Shane's third grade year, Cathy came to the District and completed a Student Registration Form, thereby re-enrolling Shane in the District while he was still attending Allied dePaul. (Doc. 8-4 at 15; Doc. 8-6 at 79–84). Cathy indicated on the form that Shane was a special education student. (Doc. 8-6 at 82). According to her testimony, she also provided whatever records she had available for Shane. (Doc. 8-4 at 15).

The only evidence in the record detailing what took place during the Shane's registration and re-enrollment was Cathy's testimony at the administrative hearing. Cathy described her registration with the District as follows:

**Q.** Do you remember that day when you went to register Shane?

**A.** Yes.

**Q.** What happened?

**A.** So I filled out the forms. I handed them to someone and I was told, am I enrolling Shane in Carbondale. I asked - - I had said, right now I'm looking for to see where the best placement for Shane is.

And I was treated very nasty. She said, well, are you enrolling him here; because if not, you're going to be arrested for truancy because he's not actually going here.

And I said, well, can you please take the records. I was like, I want to - - at this point I'm not sure where he's going right now. He's in school so I'm not going to get truancy charges.

She's like, well, if you enroll him here and he doesn't come here, then there's going to be a truant officer coming to you and you could possibly get arrested.

She was not forthcoming. She was not very, once again, warm. I tried to give her the forms. And she's like, well, we're not going to take them if he's not coming here.

And I said, you need to take these. What you do with them after I leave is fine but you need to take these. I'm giving these to the school to try to weigh out my options for my son.

I got - - like I said, she was not very nice about it. I asked her if she could actually time stamp and give me something stating that she received them. She told me that she has no stampers here or nothing and that she would not write anything down to prove that she had given me them.

With that, I had asked her name. I had wrote it on the folder, the time and the date that I actually handed them down to her because I was not - - she was not willing to give me anything saying that she had received this form or the records. And then I

> proceeded to basically put them on the counter and hand them to her and leave.

(*Id.*).

When asked why she enrolled Shane in the District, Cathy explained that it would have been easier for her to have Shane attend the District because the school was much closer to her home and more convenient than Allied dePaul in Scranton. (*Id.* at 15–16). She explained the inconvenience of having to ask family members to help her pick up or drop off Shane in Scranton. (*Id.* at 16). In addition, Cathy explained the added convenience of the District's after-school program. (*Id.*). Cathy then had the following exchange with counsel regarding her desire to place Shane in public school at the time of re-enrollment.

> **Q.** Had the school district offered an educational program in the district in September of 2013, would you have sent Shane?
>
> **A.** If there was something in place for Shane and he would be able to learn here and thrive academically, of course. All I want for my son is to have the best education possible or have him learn, like he's still . . .
>
> **Q.** Had the district offered to evaluate Shane, would you have agreed to it - -
>
> **A.** Yes.
>
> **Q.** - - prior to filing a due process complaint?
>
> **A.** Yes. Matter of fact, I'm the one who requested an evaluation when he was in Fell. Fell did not do that. I

8

actually wrote a written letter stating that I wanted him evaluated.

So, of course, I've always been partial to him being evaluated. The more needs that are met, the more help he gets.

**Q.**     Did you - - when you registered him in the district, did you make it clear you wanted him evaluated as a special education student?

**A.**     Well, that's what all the records were for so they had all of them, yes.

(*Id.* at 16). On cross-examination, Cathy reiterated that had the District offered

a program she would have been willing to have Shane attend public school.

**Q.**     When you filled out the paperwork on September 12th, was your plan to have him come to school the following day, on September 13th?

**A.**     No, because I don't know if his needs were going to be met here. I needed to know that. That's why I was giving all his documents to the school.

So if I would have gotten a phone call after they reviewed, which Angela said she did review the documents, and they would have called me and said, Cathy, great news, we can completely take care of Shane's needs, I would have definitely enrolled him the following day. The reason I gave the documents was so I was - - so you guys were aware of what his needs were and if you could meet them.

So if Angela would have looked over these documents like she said she did and told me that she could have brought me - - and Shane's needs would have been met here, of course. Like I said, then I wouldn't have to put my family in complete turmoil trying to get him to Scranton every day.

In contrast to Cathy's account of the registration process, when Mrs.

Geyer reviewed Cathy's registration packet she came to the conclusion that

Cathy intended to keep Shane at Allied dePaul. (Doc. 8-4 at 10). Cathy's re-enrollment allowed the District to pay for the services in his service plan. (*Id.*). Mrs. Geyer believed Cathy intended to keep Shane in Allied dePaul based on information received from clerical staff and based on Shane's existing service plan, which was included as part of Shane's record. (*Id.*). At the administrative hearing, Mrs. Geyer explained reaching this conclusion as follows:

> **Q.** You were asked if you had ever offered a plan in the district or an IEP, and you said no. Explain to the Hearing Officer why that was not offered when the student was registered in 2013.
>
> **A.** When I received the registration packet from the clerical staff, they informed me that the parent registered but the parent was choosing to keep the child enrolled in [Allied] dePaul. Then after reviewing the documents I found that there was an equitable participation plan and an evaluation plan completed by the [NE]IU.
> So it was my understanding that the parent was keeping her son in dePaul and receiving special education services with the option of equitable participation.

Instead of Cathy's alleged intentions to have Shane attend public school, Mrs. Geyer interpreted Shane's re-enrollment in the District as a dual enrollment and concluded that Cathy never intended to have Shane actually attend the District. The date that Cathy enrolled Shane in the District, the District did request school records from Allied dePaul. (Doc. 8-6 at 79). The September 12, 2013 date on the fax request form to Allied dePaul was notated as being Shane's "dual enrollment date." (*Id.*). The author of this notation and

10

the corresponding signature on the request were not identified by the District and the signature could not be identified by Mrs. Geyer at the hearing. (Doc. 8-4 at 8). After Cathy re-enrolled Shane in the District she did not reach out again to the District or to Mrs. Geyer specifically. (*Id.* at 86–87). Shane completed the remainder of his third grade year, the 2013–2014 school year, at Allied dePaul without further contact with the District.

On October 28, 2014, the District received a bill from the NEIU for services provided to Shane for the 2012–2013 school year. (Doc. 8-6 at 76–77). At the administrative hearing, Mrs. Geyer confirmed that the District did fund services the NEIU provided Shane. (Doc. 8-4 at 9). Specifically, Mrs. Geyer confirmed that the District did pay for Shane's speech and language services after his re-enrollment in 2013.[4] (*Id.* at 10). At some time either before or after the NEIU bill, Mrs. Geyer did reach out to Cathy to talk

---

[4] The documents submitted as evidence of the District's payment were for reimbursement for the 2012–2013 school year, the year that Cathy testified Fell Charter was paying for Shane's private school placement. (Doc. 8-6 at 76–78). The parties have not clarified why the District paid this bill for the previous year, before Shane was re-enrolled in September of 2013. The bill also did not include the actual services provided, only the administrative cost of providing these services for the 2012–2013 year. It is unclear who paid what for Shane's speech and language support for the 2012–2013 school year. The District also included a bill from NEIU for adaptive physical education for the 2013–2014 school year, after Shane's re-enrollment. (*Id.* at 78). This bill, however, does not indicate that the services provided were for Shane and, instead, indicates the services were for someone named Keith Toolan. No where is Shane's name listed on the bill and there was no testimony clarifying this absence of information.

11

about Shane. (*Id.* at 16–17). Cathy responded positively to this request but wished to speak with her attorney prior to agreeing to meet. (*Id.*). Cathy's attorney encouraged her to attend a meeting with the District. (*Id.* at 17). The meeting was scheduled for November of that year, 2014. (*Id.* at 18). Cathy was not advised of any specific agenda for this meeting; the plan was to "sit down and down about Shane." (Doc. 8-4 at 17). At this stage, all parties had counsel involved. (*See* Doc. 8-8 at 1–10 (communications exchanged between counsel)). Without explanation, Mrs. Geyer and the District cancelled the November meeting. (Doc. 8-4 at 18).

## II.   PROCEDURAL HISTORY

On July 1, 2015, the plaintiffs mailed notice of their request for a due process hearing to the District based on the District's failure to evaluate Shane after his September 12, 2013 re-enrollment. (Doc. 8-9 at 1–5). This notice advised the District that the plaintiffs would be seeking tuition reimbursement for Shane, an appropriate educational program and placement for Shane, and an IEE for Shane. (*Id.* at 1). The plaintiffs alleged violations of the IDEA, Section 504, and Title 22, Chapters 14 and 15 of the Pennsylvania Administrative Code.

Shortly thereafter, on July 15, 2015, the District mailed Cathy a consent form to complete, which, upon completion, would allow the District to reevaluate Shane. (Doc. 8-6 at 86–89). Cathy objected to the proposed

12

reevaluation and refused to give her consent. (*Id.* at 87). Cathy's handwritten reason for the objection was as follows:

> I do not consent because this offer to evaluate is an inappropriate response to my request for an IEE due to the District's failure to timly [sic] offer to evaluate my son.

(*Id.*). Administrative hearings on the due process complaint were held over the course of two days, December 4, 2015 and January 14, 2016. (Doc. 8-3; Doc. 8-4). Mrs. Geyer and Cathy testified on December 4, 2015. (Doc. 8-4). Suzanne Rickard, the principle of Allied dePaul, testified on January 14, 2016. (Doc. 8-3).

On February 23, 2016, the Hearing Officer issued a written decision. (Doc. 8-2). His decision addressed three issues: (1) whether the District was required to offer Shane an IEP; (2) whether Shane was entitled to an IEE at public expense; and (3) whether Cathy was entitled to tuition reimbursement. (Doc. 8-2 at 2). Without argument from the District, the Hearing Officer found that the District was required to provide an IEP to Shane and ordered the District to provide one, but only after an evaluation was completed. (*Id.* at 7). Next, the Hearing Officer denied the plaintiffs' request for an IEE at public expense. (*Id.* at 7–8). Lastly, the Hearing Officer concluded that Cathy was not entitled to tuition reimbursement for Shane's placement at Allied dePaul. (Id. at 9). It is the Hearing Officer's decision with respect to Shane's entitlement to

a District-paid IEE and tuition reimbursement that the plaintiffs now seek to reverse and the District seeks to uphold.

On May 23, 2016, the plaintiffs filed a complaint in this court seeking reversal of the Hearing Officer's decision. (Doc. 1). The plaintiffs' complaint alleged violations of all the federal and state provisions referenced in the due process complaint, with the inclusion of a claim under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §12101 *et seq.* The District answered the plaintiffs' complaint on July 11, 2017. (Doc. 6). The administrative record from the ODR was filed in this court on July 29, 2016. (Doc. 8). On August 2, 2016, the parties filed a joint case management plan in preparation for an August 9, 2016 case management conference. (Doc. 9). In their joint case management plan, all parties agreed that neither discovery or trial would be necessary and proposed resolution of the matter on motions for judgment on the administrative record. (*Id.* ¶¶3.0–4.1). Accordingly, no additional evidence has been submitted to the court.

On October 28, 2016, the District filed the current motion for summary judgment/motion for judgement on the administrative record, along with a statement of facts and brief in support. (Docs. 15–17). On that same day, the plaintiffs also filed their cross-motion for judgement on the administrative record, along with a brief in support. (Docs. 18–19). On November 18, 2016, the parties filed briefs in opposition. (Docs. 20–21). On November 30, 2016,

the parties filed reply briefs addressing the briefs in opposition. (Docs. 22–23). The parties motions are now ripe for review.[5]

## III.    JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction over the plaintiffs' action pursuant to 28 U.S.C. §1331 and, more specifically under the IDEA, 20 U.S.C. §1415(i)(3)(A). The IDEA expressly provides that any party aggrieved by the findings of a hearing officer may bring an action within ninety (90) days of the date of that decision without regard to the amount in controversy. 20 U.S.C. §1415(i)(2)(A)–(B). The statute also specifically provides that in any action brought under the IDEA the court "shall hear additional evidence at the request of a party" and that the court, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* §1415(i)(2)(C)(ii)–(iii). The district court "may make its own findings of fact by a preponderance of the evidence and look outside the administrative record." *Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 345 (3d Cir. 2007). In no instance, however, should the court "substitute its own notions of sound educational policy for those of local school authorities." *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) (quoting *MM*

---

[5] On December 20, 2016, the District also requested oral argument on its motion. (Doc. 24). In light of the court's decision today, the District's request will be denied as moot.

*v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 531 (4th Cir. 2002))). Here, the court relies solely on the administrative record as the parties have offered no additional evidence for the court's review.

A "nontraditional" standard of review applies to what are essentially appeals from administrative IDEA proceedings. *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 241 (3d Cir. 2009).[6] The review in IDEA cases is "unusual" insofar as the district court "must make its own findings by a preponderance of the evidence," yet afford due weight to the Hearing Officer's decision." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006) (quoting *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004)). Under this hybrid standard, the court must perform a "modified de novo review, giving 'due weight' to the underlying administrative proceedings." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 65 (3d Cir. 2010) (quoting *S.H.*, 336 F.3d at 270).

---

[6] There is no federal rule specifically addressing motions for judgement on the administrative record. Thus, the District has labeled its motion a motion for summary judgment, thereby referencing Federal Rule of Civil Procedure 56. (Doc. 15). Despite the District's title of its motion, the usual summary judgment standard under Rule 56 does not apply. *See Lillbask v. State of Conn. Dep't of Educ.*, 397 F.3d 77, n.3 (2d Cir. 2005) (explaining the role of Rule 56 in IDEA cases as a mere procedural mechanism). "Though the parties may call the procedure [in an IDEA case] a 'motion for summary judgment' in order to obtain a calendar date from the district court's case management clerk, the procedure is in substance an appeal from an administrative determination, not a summary judgment." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995).

The court exercises plenary review over the Hearing Officer's legal determinations. *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 528 n. 3 (3d Cir. 1995); *Centennial Sch. Dist. v. Phil L.*, 799 F. Supp. 2d 473, 481 (E.D. Pa. 2011). However, "[f]actual findings from the administrative proceedings are to be considered prima facie correct." *S.H.*, 336 F.3d at 270. The court should defer to the Hearing Officer's credibility determinations with respect to live testimony and give those determinations special weight. *P.S.*, 381 F.3d at 199; *see also Lauren W. v. DeFlaminis*, 480 F.3d 259, 266 (3d Cir. 2007) (noting that the district court properly deferred to the hearing officer's credibility determinations). As explained by the Third Circuit Court of Appeals:

> Specifically, this means that a [d]istrict [c]ourt must accept the state agency's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion." In this context the word 'justify' demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court.[7]

*P.S.*, 381 F.3d at 199 (quoting *Scott P.*, 62 F.3d at 528) (emphasis in original) (internal citation omitted). In addition, the court may disregard these factual findings where "the record read in its entirety would compel a contrary

---

[7] Under the ordinary appellate standard "[f]indings of fact [by the trial court], whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due weight to the trial court's opportunity to judge the witnesses' credibility." FED. R. CIV. P. 52(a)(6); *see also Knowles v. Mirzayance*, 556 U.S. 111, 126 (2009) ("[C]ourts of appeals may not set aside a district court's factual findings unless those findings are clearly erroneous.") (citing Rule 52(a) and *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985)).

conclusion." *Scott P.*, 62 F.3d at 528. "If a reviewing court fails to adhere to [the factual findings of the Hearing Officer], it is obligated to explain why." *S.H.*, 336 F.3d at 270 (quoting *MM*, 303 F.3d at 531).

It is the party challenging the Hearing Officer's decision that bears the burden of persuasion. *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1064 (D.N.J. 2011). He or she also "faces the additional hurdle of overcoming a presumption that the Hearing Officer's findings were correct." *Id.* (quoting *Andrew M.*, 490 F.3d at 345).

## IV. THE PLAINTIFFS' ENTITLEMENT TO TUITION REIMBURSEMENT

The District contends that the Hearing Officer's conclusions were correct with respect to the plaintiffs' right to tuition reimbursement. The plaintiffs disagree and allege that the Hearing Officer made both legal and factual errors in denying tuition reimbursement. The court agrees with the plaintiffs that the Hearing Officer erred in denying tuition reimbursement.

### A. The Hearing Officer's *Burlington-Carter* Analysis

The Supreme Court has set forth three factors to determine whether a parent is entitled to tuition reimbursement under the IDEA outlined in three Supreme Court decisions, *School Committee of Burlington v. Department of Education of Massachusetts*, 471 U.S. 359 (1985), *Florence County School District v. Carter*, 510 U.S. 7 (1993), and *Forest Grove School District. v. T.A.*,

[557 U.S. 230, 246–47 (2009)](the "*Burlington-Carter* test"). Applying the *Burlington-Carter* test, the Hearing Officer concluded that Cathy was not entitled to tuition reimbursement because she did not bear her burden with respect to the first factor of that test. (Doc. [8](#)-2 at 9). Specifically, the Hearing Officer concluded the District did not violate the IDEA by failing to provide a free appropriate public education ("FAPE") because the District had no obligation to do so.

Discussing this first factor, the Hearing Officer explained that under normal circumstances a school's failure to offer any program to a student would constitute a denial of a FAPE. The Hearing Officer then found that "the District was not obligated to offer a program until [Cathy] changed her mind about private school and sought placement within the District." (*Id.* at 8–9). This aligned with the Hearing Officer's factual finding that Cathy did not actually seek placement for Shane in the District despite re-enrolling him in September of 2013. (*Id.* at 4, ¶15). Specifically, the Hearing Officer's factual findings were as follows:

> There was a misunderstanding between the Parent and District staff when the Parent registered the Student [on September 12, 2013]. The Parent came to the District with registration paperwork and information about the services that the Student was receiving. The Parent also explained that the Student was attending the Private School. While I make no finding about what District staff actually said to the Parent, the Parent came away from the interaction believing that the District would instigate truancy proceedings if the

> Student enrolled but did not attend the District's schools.
>
> The foregoing interaction notwithstanding, the District understood the Parent's desire was to keep the Student at the Private School and continue to receive speech and language services from the [NE]IU.
>
> Despite some testimony to the contrary, I find that the District's understanding of the Parent's intention was correct. The Parent choose [sic] to keep the Student in the Private School and did not seek placement from or within the District.

(*Id.* at 4, ¶¶13–15 (citations to the record omitted)). In finding that Cathy did not seek placement in the District, the Hearing Officer cited to testimony from Mrs. Geyer, who was not present during Cathy's interaction with the school when she re-enrolled Shane on September 12, 2013. The Hearing Officer explicitly did not make factual findings regarding that interaction, but, nonetheless, concluded that Cathy never sought placement in the District. (*Id.* at 4, ¶¶13, 15).

The Hearing Officer did not address the second factor of the *Burlington-Carter* test in his decision. Exercising his discretion, the Hearing Officer did find that the third factor would warrant a reduction *or* denial of tuition reimbursement. (*Id.* at 9). Because no tuition was awarded, however, the Hearing Officer did not explain how much of a reduction would be warranted or if outright denial of reimbursement would be warranted.

The parties dispute the Hearing Officer's finding with respect to the District obligations to provide a FAPE to Shane. Even though the Hearing

Officer did not address the second factor or make a firm determination with respect to the third factor, the parties also argue that all of the factors under the *Burlington-Carter* test favor their position. The plaintiffs argue that the Hearing Officer's erred legally because the obligation to provide a FAPE was automatically triggered when Cathy re-enrolled Shane on September 12, 2013. In addition, the plaintiffs argue that the Hearing Officer's factual finding that Cathy had no intention of placing Shane in the District is unsupported. The court agrees with the plaintiffs that the Hearing Officer made a legal error with respect to the first factor in the *Burlington-Carter* test and will reverse his finding. The court will remand the case back to the ODR so that the Hearing Officer can make findings with respect to the second and third factor in the *Burlington-Carter* test.

## B. The IDEA

In 1970, Congress enacted the Education of the Handicapped Act, later renamed the IDEA, to assure that all children with disabilities have available to them a free appropriate public education. 20 U.S.C. §1400(d). The IDEA conditions a state's receipt of federal funds for special education programs on its implementation of "policies and procedures to ensure that . . . [a FAPE] is available to all children with disabilities." 20 U.S.C. §1412(a)(1)(A); *P.S.*, 381 F.3d 194, 198 (3d Cir. 2004); *see also C.H.*, 606 F.3d 59, 65 (3d Cir. 2010) ("Under the IDEA, a state receiving federal educational funding must provide

children within that state a [FAPE].") It "protects the rights of disabled children by mandating that public educational institutions identify and effectively educate those children, or pay for their education elsewhere if they require specialized services that the public institution cannot provide." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012) (quoting *P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009)). A public school's IDEA obligation has been summarized as two-fold: (1) "[to] identify children in need of special education services (Child Find); and (2) [to] provide a FAPE to disabled students." *D.K.*, 696 F.3d at 244.

### i. The IDEA's Child-Find Obligation

The IDEA "requires that a state have a system in place to identify, locate, and evaluate all children in the state who have disabilities and need special education and related services." *P.P.*, 585 F.3d at 730 (citing 20 U.S.C. §1412(a)(3) and 34 C.F.R. §300.111(a)). The IDEA requires that

> All children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are *identified, located, and evaluated* and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.

22

20 U.S.C. §1412(a)(3) (emphasis added). "Each state must establish procedures to fulfill this statutory directive." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 271 (3d Cir. 2012) (citing 34 C.F.R. §300.111). Pennsylvania has implemented the IDEA requirements, including these child-find procedures, in Title 22, Chapter 14 of the Pennsylvania Administrative Code. 22 PA. CODE §14.101 *et seq.* Pursuant to the child-find duty, schools must identify and evaluate a child within a "reasonable time after school official are on notice of behavior that is likely to indicate a disability." *W.B. v. Matula*, 67 F.3d 484, 501 (3d Cir. 1995), *abrogated on other grounds by A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007).

### ii.    The IDEA's FAPE Obligation

Once a disabled child is "found" so to speak, a FAPE will "consist[ ] of educational instruction specifically designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to 'benefit' from the instruction." *W.B.*, 67 F.3d at 491 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188-89 (1982)). Providing a FAPE requires that the student be educated in the "least restrictive environment," defined as, to the extent appropriate, education with children who are not disabled and in the regular education environment. 20 U.S.C. §1412(a)(5)(A). This has been labeled as the IDEA's "mainstreaming requirement." *S.H.*, 336 F.3d at 265.

The "centerpiece" for implementing a FAPE and delivering education to disabled children is the IEP, which is developed for each disabled child. *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010) (quoting " *Polk, 853 F.2d at 173*); *see also* 20 U.S.C. §1412(a)(4) (requiring an IEP for disabled children). "The IEP consists of a detailed written statement arrived at by a multi-disciplinary team summarizing the child's abilities, outlining the goals for the child's education and specifying the services the child will receive." *Polk*, 853 F.2d at 173; *Melissa S. v. Sch. Dist. of Pittsburgh*, 183 F. App'x 184, 186–87 (3d Cir. 2006). An IEP need not provide "'the optimal level of services' a parent might desire for their child." *D.S.*, 602 F.3d at 557 (quoting *Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 590 (3d Cir. 2000)). It does require, in accordance with the mainstreaming requirement, that the IEP "be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." *Id.* (quoting *P.S.*, 381 F.3d at 198).

Generally, the IDEA requires that an IEP be in place "[a]t the beginning of each school year." 20 U.S.C. §1414(d)(2)(A); *C.H.*, 606 F.3d at 68. Under normal circumstances, an IEP is developed after a parent is given notice of and consents to an initial evaluation of the child. 20 U.S.C. §1414(a)(1)(D)(i). The IEP must be reviewed at least annually to ensure that stated goals are being achieved. *Id.* §1414(d)(4)(A)(I); *D.S., 602 F.3d at 557*. "When appropriate the team will revise the IEP to address, among other things, lack

of progress, necessary changes arising from reevaluation of the child, and parental input." *D.S., 602 F.3d at 557* (citing 20 U.S.C. §1414(d)(4)). A complete reevaluation may be performed if either the school determines the child's performance warrants reevaluation or the child's parent or teacher requests a reevaluation. 20 U.S.C. §1414(a)(2)(A).

### iii.  Equitable Participation and Private School Children

A different statutory framework exists for disabled children who are parentally-placed in private school. *E.T. v. Bd. of Educ. of Pine Bush Cent. Sch. Dist.*, No. 11-CV-5510, 2012 WL 5936537, at *11 (S.D.N.Y. Nov. 26, 2012). States must allocate a proportionate share of funds for these parentally-placed private school children to provide them with related services, commonly known as equitable participation. *Id.*; 20 U.S.C. §1412(a)(10). However, "[n]o parentally-placed private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school." 34 C.F.R. §300.137(a). A state's specific obligations to parentally-placed private school children are detailed in 34 C.F.R. §§300.130–300.144. These  students are not entitled to an IEP but a "less comprehensive 'services plan.'" *Dist. of Columbia v. Vinyard*, 971 F. Supp. 2d 103, 108 (D.D.C. 2013) (quoting 34 C.F.R. §§300.137(c), 300.138(b)).

25

The child-find obligation, however, does apply to both public and parentally-placed private school children. 20 U.S.C. §1412(a)(10)(A)(ii)(I). But, the obligation differs such that "[t]he child find process shall be designed to ensure the equitable participation" of parentally-placed private school children, not a FAPE. *Id.* §1412(a)(10)(A)(ii)(II). Unlike public school children, the educational unit with child find and equitable participation obligations for private school children is determined based on the location of the private school, not the child's residence. 34 C.F.R. §300.132(b). In Pennsylvania, intermediate units are responsible for child-find obligations with respect to parentally-placed private school children. 22 PA. CODE §14.121(d). Thus, as explained by Pennsylvania's Bureau of Special Education ("BSE") within the state's Department of Education, in Pennsylvania, "it is conceivable that a parent could obtain evaluations from both the [intermediate unit] the private school is located [in] and the school district of residence." *Questions and Answers Regarding Equitable Participation,* ¶1 (May 2014), http://www.education.pa.gov (Follow "K-12" tab at top of page and click on "Special Education" link, scroll page to find "Equitable Participation Q & A" pdf document).

Although parentally-placed private school children do not automatically receive an evaluation and IEP, the public school where that child resides is not automatically freed all of its IDEA obligations just because the parent has made a private decision to enroll the child in private school. *J.S. v. Scarsdale*

*Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 665–66 (S.D.N.Y. 2011) (collecting cases); *E.T.*, 2012 WL 5936537, at \*14 (collecting cases). Instead, the obligation may be "shared." *J.S.*, 826 F. Supp. 2d at 665. In a well-reasoned opinion and after review of case law within and outside this circuit, Judge Jones in this district concluded that "where a parent either re-enrolls their child in the public school or requests evaluations with the intention of re-enrolling the student, the public school is required to evaluate the child and develop an IEP for purposes of *proposing* a FAPE." *I.H. v. Cumberland Valley Sch. Dist.*, 842 F. Supp. 2d 762, 772–773 (M.D. Pa. 2012) (emphasis added). In that case, the child was enrolled in a charter school, but only after the child had been enrolled in public school and the school had failed to offer a satisfactory special education plan. *Id.* at 768. Judge Jones found that the fact that the child was enrolled in a private school did not obviate the public school's obligation to provide an IEP. *Id.* at 772. This finding comported with other courts that have found that "residency, rather than enrollment, triggers a district's FAPE obligations." *E.T.*, 2012 WL 5936537, at \*14 (quoting *S.D.*, 811 F. Supp. 2d at 1071).

This obligation of a public school to evaluate a private school child upon request of the parent, whether or not the student enrolls, is clearly supported by policy documents issued by the Office of Special Education and Rehabilitative Services ("OSERS"), a division of the U.S. Department of

Education. In a 2011 policy document issued by the OSERS, the agency explicitly stated that

> Although the Department discourages parents from requesting evaluations from two [local education agencies ("LEAs")], if the parent chooses to request evaluations from the LEA responsible for providing the child FAPE and from another LEA that is responsible for considering the child for the provision of equitable services, both LEAs are *required* to conduct an evaluation.

*Questions and Answers on Serving Children with Disabilities Placed by Their Parents in Private Schools*, Question B-4, (revised April 2011), available at https://sites.ed.gov/idea/files/Private_School_Q_A_April_2011_1.pdf (emphasis added).[8] Similarly, the Pennsylvania BSE has adopted this approach with respect to a public school's obligation to parentally-placed private school students. In a question and answer document dealing with equitable participation the agency explained as follows:

> *A parent can request an evaluation from their school district under any circumstances.* The school district has the option of either conducting the evaluation or issuing a Notice of Recommended Educational Placement (NOREP) declining to evaluate and offering the parents the opportunity to initiate due process proceedings. *The resident district cannot refuse to evaluate a child because the child is attending a*

---

[8] The court gives deference to the agency's reasonable interpretation of its own regulations. *See Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1073 (D.N.J. 2011) ("When an agency interprets its own regulations, a very deferential standard applies; such an interpretation is 'controlling unless plainly erroneous or inconsistent with the regulation.'" (quoting *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 397 (2008))).

> private school or because the [intermediate unit] also
> has a duty to evaluate the child.

*Questions and Answers Regarding Equitable Participation*, ¶7 (May 2014) (emphasis added). In a separate question and answer document, the BSE again explained the continuing obligation of the school district of residence.

> **[Question:] What if the parent contacts the District of Residence for a special education evaluation and the district asks, 'Are you going to bring them back?' Parent responds 'no' and the District refers the parent to the [intermediate unit] for an evaluation?**
>
> [Answer:] At the evaluation stage, the district may not ask about a parent's intent to enroll in the district. The district has a child find responsibility and a refusal to conduct the IDEA evaluation requires the district to issue a NOREP/PWN.

*Questions and Answers regarding Act 89 and Equitable Participation (IDEA)*, ¶17, http://www.education.pa.gov (Follow "K-12" tab at top of page and click on "Special Education" link, scroll page to find "Act 89 and Equitable Participation" pdf document).

Case law, OSERS policy guidance, and BSE policy guidance are also supported by the express language of the IDEA which explicitly provides that a reevaluation must be performed if either the school determines the child's performance warrants reevaluation or the child's parent or teacher requests a reevaluation. 20 U.S.C. §1414(a)(2)(A); *see also Dist. of Columbia v. Wolfire*, 10 F. Supp. 3d 89, (D.D.C. 2014) (examining this provision to

conclude that enrollment is not a prerequisite for an evaluation where the parent requests an evaluation).

### iv.    IDEA Remedies and Tuition Reimbursement

The IDEA allows for private causes of action if a school district fails to meet its IDEA obligations. *C.H.*, 606 F.3d at 66 (3d Cir. 2010). Initially the inquiry is two-fold: (1) Has the school district complied with the procedures set forth in the IDEA? and (2) Has the school district fulfilled its obligation to provide the student with a FAPE? *Id.* (citing *Bd. of Educ. of Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206–07 (1982)). A procedural violation may entitle the parent to tuition reimbursement but only if that violation rises to the level of a denial of a FAPE. *Id.* The violation will rise to the level of a denial of a FAPE "only if such violation causes substantive harm to the child or his parents." *Id.* (quoting *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 765 (6th Cir. 2001) (citations omitted)). For example, failing to have a timely IEP in place after an evaluation is technically a procedural violation. *See C.H.,* 606 F.3d at 68 n. 7 (classifying the failure to have a timely IEP in place as a procedural violation). But, "when a child requires special-education services, a school district's failure to propose an IEP of any kind is at least as serious a violation of its responsibilities under [the] IDEA as a failure to provide an adequate IEP[,]" thereby taking into account the child-find obligation. *Forest Grove*, 557 U.S. at 238–39, 245.

Violations that rise above a procedural violation without substantive harm may entitle the parent to tuition reimbursement for a private school placement. *C.H.*, 606 F.3d at 66. As a general matter a parent is not entitled to tuition reimbursement if a FAPE was made available to the child but the parent nonetheless chose to enroll the student in private school. 20 U.S.C. §1412(a)(10)(C)(i). However, "[w]hen a state is unable to provide a [FAPE] to a child but a private school can provide that education, the state must reimburse the child's parents for the private school costs." *D.S.*, 602 F.3d at 557. In those instances the parent "may unilaterally remove their disabled child from that school, place him or her in another school, and seek tuition reimbursement for the cost of the alternative placement." *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 242 (3d Cir. 2009) (citing 20 U.S.C. §1412(a)(10)(C)).

The Supreme Court made clear in *Forest Grove* that a child may still be entitled to tuition reimbursement even if the child never received special education services in the public school before. 557 U.S. at 247. Also, a child-find violation and utter failure to propose an IEP may entitle the parent to tuition reimbursement. As stated by the Supreme Court, "[a] reading of the [IDEA] that left parents without an adequate remedy when a school district unreasonably failed to identify a child with disabilities would not comport with Congress' acknowledgment of the paramount importance of properly identifying each child eligible for services." *Id.* at 245. The court takes away from *Forest Grove* the general principle that a failure to evaluate and provide

31

an IEP where the public school must do so is a denial of FAPE entitling the parent to possible tuition reimbursement. It is not just a procedural violation, akin to failing to have an IEP in place on the first day of school, but a substantive child-find violation that, in turn, leads to the denial of a FAPE.

The right to tuition reimbursement is guided by the *Burlington-Carter* test that the Hearing Officer correctly relied on in his February 23, 2016 decision. Under this test, first, the court must find that the IEP is not appropriate for the child or, otherwise stated, that there was a denial of a FAPE. *Forest Grove*, 557 U.S. at 247; *Lauren W.*, 480 F.3d at 276. This first inquiry is sometimes broken into a two-part inquiry regarding procedural vs. substantive violations. *E.T.*, 2012 WL 5936537, at \*12. Whether there was a denial of a FAPE is a mixed question of law and fact. *Dallas Indep. Sch. Dist. v. Woody*, No. 16-10613, -- F.3d --, 2017 WL 3187675, at \*3 (5th Cir. July 27, 2017); *N.W. v. Boone Cnty. Bd. of Educ.*, 763 F.3d 611, 615 (6th Cir. 2014); *K.E. v. Indep. Sch. Dist.*, No. 15, 647 F.3d 795, 804 (8th Cir. 2011). Here, the failure to evaluate and prepare an IEP for Shane would be a denial of a FAPE if the District was obligated to do so.

Next, the court must find that the private school placement is appropriate. *Forest Grove*, 557 U.S. at 247; *Lauren W.*, 480 F.3d at 276. The private school placement will be deemed appropriate if "it provides significant learning and confers meaningful benefit . . . in the least restrictive environment." *DeFlaminis*, 480 F.3d at 276 (internal quotation marks omitted).

If the first two prongs are met tuition reimbursement is an appropriate remedy, but reimbursement may be reduced or denied fully based on equitable considerations. *Forest Grove*, 557 U.S. at 246–47. This is the court's third and final inquiry with respect to tuition reimbursement. This inquiry aligns with the statute's express limitations on reimbursement if there are certain equitable findings. 20 U.S.C. §1412(a)(10)(C)(iii).[9] In particular, the Supreme Court has

---

[9] This provision states:

The cost of reimbursement described in clause (ii) may be reduced or denied --

(I)     if–

     (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

     (bb)10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);

(II)    if, prior to the parents' removal of the child from public school, the public agency informed the parents, through the notice requirements in section 1415(b)(3) of this title, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or

(III) upon a judicial finding of unreasonableness with respect to actions

33

emphasized that courts should consider whether the parents failed to give adequate notice of their intent to enroll the child in private school as an equitable factor in its determination. *Forest Grove*, 557 U.S. at 246. "In considering the equities, courts should generally presume that public-school officials are properly performing their obligations under [the] IDEA." *Id.* at 247.

## C.    Discussion

In his February 23, 2016 decision, the Hearing Officer did not conclude that the District offered a FAPE under the first factor of the *Burlington-Carter* test but that the District was not obligated to do so "until the parent expressed an interest in receiving services from the District." (Doc. 8-2 at 8). The court finds that the Hearing Officer erred in making this part legal and part factual determination. The court finds that the Hearing Officer erred in finding that the District had no obligation "until the parent expressed an interest in receiving services from the District." (*Id.* at 8). The inquiry is quite the opposite.

---

taken by the parents.

20 U.S.C. §1412(a)(10)(C)(iii). The only factor that could possibly warrant tuition reduction or denial is a "finding of unreasonableness with respect to actions taken by the parent[,]" *Id.* §1412(a)(10)(C)(iii)(III), or some broader equitable consideration allowed by *Forest Grove*. The remaining statutory reasons would not apply as they contemplate a child who was already in the public school and was removed and placed into private school. Shane was already enrolled in private school before his re-enrollment in the District. Cathy chose not to keep him there, as was her right.

Moreover, his factual determination that Cathy "did not seek placement from or within the District" when she re-enrolled Shane and that she did not intend to place Shane in public school, (*id.* at 4, ¶¶14–15), indicated both a legal error regarding the proper inquiry and, factually, is not supported by the record. (*Id.* at 4, ¶15).

The case law is clear that enrollment of the student or a parent's request for evaluation would normally trigger the District's obligation to provide a FAPE. *I.H.*, 842 F. Supp. 2d at 772–773; *S.D.*, 811 F. Supp. 2d at 1071. What is less clear is how explicit the parent must make their request for an evaluation or if an explicit request is required where the state allows for dual enrollment of one student.[10] No where in Cathy's testimony does she state that she made an explicit request for an IEP or evaluation and there is no evidence of an explicit request. The court must, in essence, ask whether Cathy's actions on September 12, 2013 were enough to trigger the District's obligations and the court answers this question in the affirmative. Moreover, none of the case law the court has analyzed has dealt with the problems of dual enrollment in the IDEA scheme. The court finds that this state device does not alter the District's IDEA obligations.

---

[10] 24 PA. STAT. §5-502 ("No pupil shall be refused admission . . . by reason of the fact that his elementary or academic education is being or has been received in a school other than a public school."); *Lower Merion Sch. Dist. v. Doe*, 931 A.2d 640 (Pa. 2007) (interpreting 24 PA. STAT. §5-502 in conjunction with Section 504 to allow a dually enrolled student to receive Section 504 services without cost while also attending private school).

First, the court addresses whether, under normal circumstances, the parent must make his or her request clear to the public school that he or she desires an evaluation and IEP for the child. Case law and OSERS answers to comments when amending the regulations providing for parentally-placed private school children in 2006 suggest the opposite. OSERS received commentary requesting clarification of the role of the LEA of the child's residence where the child is a private school student. The OSERS answer was clear that

> If a determination is made by the LEA where the private school is located that a child needs special education and related services, *the LEA where the child resides is responsible for making FAPE available to the child. If the parent makes clear his or her intention to keep the child enrolled in the private elementary school or secondary school located in another LEA, the LEA where the child resides need not make FAPE available to the child.*

*Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities*, 71 Fed. Reg. 46539, 46593 (Aug. 14, 2006) (amending 34 C.F.R. parts 300–301, 304) (emphasis added). The agency reiterated this basic position again in a 2011 policy document, stating the school's obligation in negative terms:

> If a determination is made through the child find process by the LEA where the private school is located that a child needs special education and related services *and a parent makes clear his or her intent to keep the child enrolled in the private elementary or secondary school located in another LEA, the LEA where the child resides is not required*

36

> to make FAPE available to the child. However, if the
> parents choose to accept the offer of FAPE and enroll
> the child in a public school, then the LEA where the
> child resides is obligated to make FAPE available to
> the child.

*Questions and Answers on Serving Children with Disabilities Placed by Their Parents in Private Schools*, Question B-5 (Revised April 2011) (emphasis added). Several courts have evaluated this language and accepted it as a correct interpretation of the public school's obligation to private school students. *E.g., Vinyard*, 971 F. Supp. 2d at 109; *S.D.*, 811 F. Supp. 2d at 1071. Reading this language, it is not the parent's obligation to clearly request an IEP or FAPE; instead, it is the school's obligation to offer a FAPE unless the parent makes clear his or her intent to keep the student enrolled in the private school. This language must comport with the case law holding that a parent need not disenroll their child from private school and enroll the child in public school in order for the child to be entitled to a FAPE. *I.H.*, 842 F. Supp. 2d at 772–773; *S.D.*, 811 F. Supp. 2d at 1071. In line with both of these principles, it is not the secret desire of the parent that matters, but the objective manifestation of those desires that dictate whether or not the public school must offer a FAPE. If a parent comes to the District and clearly indicates that he or she has no intention of ever placing the child in public school, the school need not offer a FAPE. That is not the case here.

Here, Cathy re-enrolled Shane in the District but the Hearing Officer nonetheless concluded that the District was not obligated to provide a FAPE

because Cathy had no intention of placing Shane in the District. His legal conclusion was in error. Re-enrollment is enough to trigger the District's FAPE obligations and the parent's "intent" is only relevant where it is objectively made clear to the public school. Until then, the public school is obligated to provide a FAPE. Under normal circumstances, it is clear that enrollment in public school would trigger the IDEA's FAPE obligations. *I.H.*, 842 F. Supp. 2d at 772–773 ("where a parent either re-enrolls their child in the public school or requests evaluations with the intention of re-enrolling the student, the public school is required to evaluate the child and develop an IEP for purposes of proposing a FAPE." ). Intent is only relevant where there was no enrollment, which was not the case here. Further, when intent is relevant, it is not the secret intention of the parent that dictates the school's initial FAPE obligations but whether or not that the "parent makes clear his or her intent to keep the child enrolled in the private elementary or secondary school located in another LEA" whether or not a FAPE is offered. *Questions and Answers on Serving Children with Disabilities Placed by Their Parents in Private Schools*, Question B-5 (Revised April 2011) (emphasis added).

The exchange between Cathy and District on September 12, 2013 in no way "clearly" indicated that Shane would be staying at Allied dePaul from an objective perspective. Quite the contrary. During Cathy's testimony, the only evidence of what took place on September 12, 2013, she explained that she filled out the forms, and was asked "am I enrolling Shane in Carbondale." (Doc.

38

[8](#)-4 at 15). Cathy testified that she responded by stating, "right now I'm looking for [sic] to see where the best placement for Shane is." (*Id.*). Cathy then described the following exchange with the District's personnel:

> And I was treated very nasty. She said, well, are you enrolling him here; because if not, you're going to be arrested for truancy because he's not actually going here.
> And I said, well, can you please take the records. I was like, I want to - - *at this point I'm not sure where he's going right now. He's in school so I'm not going to get truancy charges.*
> She's like, well, if you enroll him here and he doesn't come here, then there's going to be a truant officer coming to you and you could possibly get arrested.
> She was not forthcoming. She was not very, once again, warm. I tried to give her the forms. And she's like, well, we're not going to take them if he's not coming here.
> And I said, you need to take these. What you do with them after I leave is fine but you need to take these. *I'm giving these to the school to try to weigh out my options for my son.*

(*Id.* (emphasis added)). Though at no time did she clearly state, "I am requesting an evaluation" or "I am requesting an IEP," the above testimony indicated that her statements to District personnel on September 12, 2103 included the following:

1. [R]ight now I'm looking for [sic] to see where the best placement for Shane is;

2. [A]t this point I'm not sure where he's going right now; and

3. I'm giving these to the school to try to weigh out my options for my son.

(Doc. 8-4 at 15). None of these statements provided clear indication to the District that Cathy would be keeping Shane in Allied dePaul even if the District offered Shane a FAPE. At best, her statements were ambiguous, leaving the District obligated to offer a FAPE until there was some clear indication that Cathy would be keeping Shane in private school. Even if she was unclear or simply unsure, it was the District's obligation to offer services to Shane. The court could find no case law holding that a parent is obligated to make a clear request for evaluation or an IEP during the enrollment process.

In addition, the court finds that the Hearing Officer's factual conclusions with respect to Cathy's intentions are unsupported. The Hearing Officer concluded that Cathy intended to keep Shane in private school and did not seek placement in the District "[d]espite some testimony to the contrary." (Doc. 8-2 at 4, ¶¶14–15). In the first instance, the Hearing Officer made no finding about what happened on September 12, 2013 when Cathy re-enrolled Shane stating he would make "no finding about what District staff actually said to [her]." (Doc. 8-2 at 4, ¶13). He then found that Cathy "came away from the interaction believing that the District would instigate truancy proceedings if the Student enrolled but did not attend the District's schools." (*Id.*). In that instance, while he had no evidence other than hearsay regarding the interaction, he credited Cathy's testimony.

Next, the Hearing Officer concluded that the "District understood the Parent's desire was to keep the Student at the Private School and continue to

receive [equitable participation]." (*Id.* ¶14). He cited to Mrs. Geyer's testimony in making this finding. In her testimony, Mrs. Geyer explained reaching her conclusions with respect to Shane as follows:

> When I received the registration packet from the clerical staff, they informed that the parent registered but the parent was choosing to keep the child enrolled in [Allied] dePaul. Then after reviewing the documents I found that there was an equitable participation plan and an evaluation plan completed by the [NE]IU.
> So it was my understanding that the parent was keeping her son in [Allied] dePaul and receiving special education services with the option of equitable participation.

(Doc. 8-4 at 10).

After restating the District's understanding of Cathy's desires with respect to Shane, the Hearing Officer found that the District's understanding was "correct"—*i.e.*, that Cathy intended to keep Shane in private school—and that Cathy "did not seek placement from or within the District." (*Id.* ¶15). He again cites Mrs. Geyer, who was not present during enrollment and who reached her own conclusions after seeing Shane's service plan. (*Id.*).

The testimony relied upon by the Hearing Officer does not support his factual finding regarding Cathy's intent. His citation to Mrs. Geyer's testimony does not support the factual finding that Cathy did not seek placement in the District. Either the Hearing Officer credited unknown clerical staff that did not testify at the hearing or the Hearing Officer concluded that, even if Cathy's testimony was correct and accurate, what she really wanted was equitable

participation, not an offer of FAPE. Neither of these findings are supported by the actual record.

There is no evidence that Cathy made any statements indicating that she had no desire to place Shane in the District. Instead, she testified that she gave records to the District "to try to weigh out [her] options for [her] son." (Doc. 8-4 at 15). When asked whether she made it "clear" that she wanted Shane evaluated, Cathy responded by stating, **"**Well, that's what all the records were for so they had all of them, yes." (*Id.* at 16). It is arguable whether this sort of action "clearly" indicates a request for anything, but this testimony was consistent with Cathy's testimony that she had some desire for Shane to attend the District because it was convenient for her and her family. To state otherwise would be to discredit a large portion of Cathy's testimony. The Hearing Officer made no explicit credibility finding to that effect. Quite the opposite, he believed portions of Cathy's testimony regarding her September 12, 2013 interaction with District personnel.

More importantly, as explained above, the Hearing Officer's inquiry into Cathy's actual intent on September 12, 2013 was not the proper inquiry. The proper inquiry was whether it was clear to the District that Shane would not be attending the District even if a FAPE was offered. Without contradictory evidence or other testimony about the September 12, 2013 registration process, there is nothing "clear" in the record to show this and the evidence, as a whole, suggests the opposite was true. There is nothing in the record to

contradict Cathy's version of events on that day. The District concedes that she came on that day, re-enrolled Shane, indicated her son was disabled on the registration form, and provided paperwork, which happened to include a service plan at the time. In that moment, the District had all it needed to be able to begin discussions with Cathy about offering a FAPE to Shane. Further, the fact that she was "keeping her son in [Allied] dePaul" was not enough for the District to automatically be relieved of its IDEA obligations. (Doc. 8-4 at 10). If this was the District's assumption, then this assumption was incorrect. Cathy was entitled to keep her son in private school until the District made an offer of FAPE to Shane, in accordance with *Forest Grove.* It is only if Cathy were to clearly indicate a rejection of any such offer that the District would be relieved of its IDEA obligation.

Next, the court addresses whether the ability to dual enroll a student for the payment of services proposed by a different LEA, in this case the NEIU, altered the District's obligation to propose a FAPE to Shane. Here, unidentified District personnel concluded that Shane was not actually re-enrolling but was being dual enrolled. (Doc. 8-6 at 79). The court finds that this state device did not alter the District's obligations under the IDEA.

In passing the regulations providing for parentally-placed private school children, OSERS received comments requesting that the regulations not apply to states with dual enrollment provisions. The agency's response was, in part, as follows:

> With regard to the comment requesting that the child find and equitable participation requirements for parentally-placed private school children with disabilities not apply in States with dual enrollment, there is no exception in the Act to the child find and equitable participation requirements of section 612(a)(10(A) for States that permits dual enrollment of a child at a parent's discretion. Therefore, there is no basis to regulate to provide such an exception. It would be a matter of State or local discretion to decide whether to have a dual enrollment policy and, if established, how it would be implemented. Whether dual enrollment alters the rights of parentally-placed private school children with disabilities under State law is a State matter.

71 Fed. Reg. at 46590. Reviewing the IDEA the court agrees with OSERS position that there is no exception in the IDEA for states with dual enrollment provisions when in comes to servicing parentally-placed private school children. Moreover, there is no exception for states with dual enrollment provisions anywhere in the statute. Thus, when Cathy re-enrolled Shane in the District on September 12, 2013 with an existing service plan, the fact that Pennsylvania law allowed the District to classify Shane as "dually-enrolled" and, therefore, pay for these services did not obviate the District's IDEA obligations to Shane in that moment.

In addition, the fact that Shane had an existing service plan also did not lessen the District's IDEA obligations. The BSE has made it clear that "[t]he resident district cannot refuse to evaluate a child because the child is attending a private school or because the [intermediate unit] also has a duty to evaluate the child." *Questions and Answers Regarding Equitable Participation*, ¶7.

44

Thus, although the District concluded that Cathy simply wanted dual enrollment and equitable participation because her documents included a service plan, this assumption was in error. (Doc. 8-4 at 10). The fact that Shane had a service plan did not lessen the District's obligation. Though it appears that it was possibly a misunderstanding and not a "refusal" to evaluate Shane, there is no reason for this distinction to make a difference with respect to the first factor of the *Burlington-Carter* test.

The District failed in its IDEA obligations when Cathy re-enrolled Shane in the District, notified the District of Shane's disabilities, and the District failed to offer a reevaluation and propose a FAPE. As such, the Hearing Officer's erred with respect to this first factor in the *Burlington-Carter* test. Accordingly, his finding that Cathy was not entitled to tuition reimbursement because the District was not obligated to provide Shane with a FAPE will be reversed.

Although the plaintiffs seek judgment in their favor on the issue of tuition reimbursement, the court will instead remand to the Hearing Officer for further consideration of the *Burlington-Carter* test. In this circuit, the court is authorized to remand where clarification of the record is required. *Evan H. v. Unionville-Chadds Ford Sch. Dist.*, No. 07-4990, 2008 WL 4791634, at *2 (E.D. Pa. Nov. 4, 2008)(citing *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 526 (3d Cir. 1995)); *see also Centennial Sch. Dist. v. Matthew L.*, 799 F. Supp. 2d 473, 491 (E.D. Pa. 2011) (remanding to the Hearing Officer for further facts and conclusions of law with respect to the denial of a FAPE)). "Remand may

also be appropriate when a hearing officer applies the wrong legal standard." *Evan H*., 2008 WL 4791634, at \*2.

Here, the Hearing Officer did not make any findings with respect to the appropriateness of Allied dePaul as a private school placement, the second consideration in the *Burlington-Carter* test. The parties clearly disagree on this issue. The Hearing Officer had the benefit of live testimony from Ms. Rickard, the principle at Allied dePaul who spoke about the school's programs in some detail. Clarification of this testimony and Shane's school record at Allied dePaul is best left in the hands of the state's educational administrative body, the ODR.

Similarly, with respect to the third factor, the Hearing Officer suggested that equitable considerations might warrant a significant reduction or denial of tuition reimbursement under 20 U.S.C. §1412(a)(10)(C)(iii). (Doc. 8-2 at 9). This possibility was not clarified based on the Hearing Officer's finding that the District had no obligation to offer Shane a FAPE. The Hearing Officer's finding regarding equitable considerations should be clarified in the light of the court's decision today.

The court agrees that there are equitable factors the Hearing Officer should consider if it is determined that Allied dePaul is an appropriate school placement. In particular, the court notes that Cathy did not follow up with the District for over a year and, instead, waited for the District to reach out to her after Shane's re-enrollment on September 12, 2013. This unusual delay took

place despite the fact that she had some experience requesting IEPs before. (*See* Doc. 8-4 at 16 (testifying that Shane's initial IEP at Fell Charter was done at her written request)). Thus, while the District had notice that Shane was in Allied dePaul, there appears to have been no notice that Cathy would be seeking tuition reimbursement for at least a year. *See Forest Grove*, 557 U.S. at 246 (indicating that notice to the public school is an important consideration).

The court also notes that the Third Circuit, in circumstances dealing with the appropriateness of an IEP, has indicated that failing to place the educational problem at issue with the school for more than a year is unreasonable. *Bernardsville Bd. of Educ. v. J.H.*, 42 F.3d 149, 158 (3d Cir. 1994). In *Bernardsville* the court explained as follows:

> We, of course, recognize that the school district has the duty in the first instance to provide an appropriate IEP, and moreover, to demonstrate by a preponderance at a due process hearing that the IEP it offered was indeed appropriate. With that foremost in mind, we must nevertheless also recognize that as a practical reality, and as a matter of procedural law of which [the] parents where fully apprised, the right of review contains a corresponding duty parental duty to unequivocally place in issue the appropriateness of an IEP. This is accomplished through the initiation of review proceedings within a reasonable time of the unilateral placement for which reimbursement is sought. We think more than two years, indeed, more than one year, without mitigating excuse, is unreasonable delay.

*Id.* (footnote omitted). Although the IDEA was amended in 2004 to include an explicit two-year statute of limitations for due process complaints, 20 U.S.C. §1415(f)(3)(C), courts have used the reasoning in *Bernardsville* to deny tuition reimbursement claims on equitable grounds. *E.g.*, Mittman v. Livingston Twp. Bd. of Educ., No. 09-4754 (DRD), 2010 WL 3947548, at \*5 (D.N.J. Oct. 7, 2010). The unusual facts of this case may warrant further consideration.

In addition, at least one court has concluded that the parent's actual intent should play a role in considering the equities. *E.T.*, 2012 WL 5936537, at \*16. While the court finds that only objective intent made clear to the public school matters with respect to the initial offering of a FAPE, the court also agrees that behavior indicating no desire or a change in desire to place the child in public school after the re-enrollment is an equitable factor to keep in mind. Whether these equities would lead to a denial *or* reduction of tuition reimbursement is appropriately left to the administrative agency to determine in the first instance.

## V. THE PLAINTIFFS' ENTITLEMENT TO AN IEE AT PUBLIC EXPENSE

Lastly, the parties dispute the Hearing Officer's finding that Shane was not entitled to an IEE at public expense. (Doc. 8-2 at 9). Specifically, the District contends that the Hearing Officer correctly found that the District was not obligated to fund an IEE until Cathy disagreed with some initial evaluation. While the District argues that this legal determination was correct, the plaintiffs

48

disagree and have advanced the same argument that was advanced at the administrative proceeding, an argument that the Hearing Officer rejected. They primarily rely on a February 23, 2015 policy letter issued by the OSERS. The court agrees with the Hearing Officer that Shane is not entitled to a District-funded IEE and will affirm his decision.

The Hearing Officer described two reasons in his February 23, 2016 decision why Shane was not entitled to an IEE. Initially, he explained that "an IEE at public expense is not triggered until the Parent disagrees with the District's evaluation" and "[i]n this case, there [was] no District evaluation for the [p]arent to disagree with." (*Id.* at 7). The Hearing Officer then explained that the right to an IEE would also be triggered "when an LEA has an obligation to evaluate but does not do so," thereby failing to meet child-find obligations under the IDEA. (*Id.* at 8). Applying these principles, the Hearing Officer concluded that the District had not violated any child-find obligations, Shane was "found," and Cathy "exercised a choice to privately educate [Shane]." (*Id.*). The court will affirm on the first ground alone.

"A parent has the right to an [IEE] at public expense if the parent disagrees with an evaluation obtained by the public agency." 34 C.F.R. §300.502(b)(1); *P.P.*, 585 F.3d at 740; *see also* 22 PA. CODE §14.102(a)(2)(xxix) (expressly adopting 34 C.F.R. §300.502 by incorporation). "A parent is entitled to only one independent educational evaluation at public expense each time the public agency conducts an evaluation with which the

parent disagrees." 34 C.F.R. §300.502(b)(5). "[T]he object of parents' [sic] obtaining their own evaluation is to determine whether grounds exist to challenge the District's." *Warren G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 87 (3d Cir. 1990). Moreover, the Third Circuit has applied the regulation "broadly to permit reimbursement not only when the parents expressly disagree with the evaluation but also when 'the parents[ ] fail[ ] to express disagreement with the District's evaluations prior to obtaining their own' evaluation'" in order to render meaning to the regulation's above-stated purpose. *Lauren W.*, 480 F.3d at 274–75 (quoting *Warren G.*, 190 F.3d at 87) (alteration in original). Consistent with the above, in a February 23, 2015 private letter relied on by the plaintiffs the OSERS concluded that a parent has a right to an IEE "[w]hen an evaluation is conducted . . . and a parent disagrees with the evaluation because [the] child was not assessed in a particular area." Letter from Melody Musgrove, Dir. of Office of Special Educ. Programs, U.S. Dep't of Educ., to Debbie Baus (Feb. 23, 2015), https: //www2.ed.gov/policy/speced/guid/idea/memosdcltrs/acc-14-012562r-baus-i ee.pdf.

Here, as the Hearing Officer noted, there was no public evaluation of Shane. Thus, there was nothing for the plaintiffs to object to. The regulation that allows parents to obtain district-funded IEEs envisions a public evaluation prior to the parents obtaining the IEE. This right is triggered "each time the public agency conducts an evaluation with which the parent disagrees." 34

C.F.R. §300.502(b)(5). Even in the private letter relied upon by the plaintiffs, there is some public evaluation of the child that is somehow lacking which then triggers the right to an IEE to evaluate those areas that were missed, presumably to challenge the public evaluation. Letter from Melody Musgrove (allowing an IEE "[w]hen an evaluation is conducted . . . and a parent disagrees with the evaluation"). The regulation does not envision the circumstances here, where there has been no initial evaluation to object to.

Moreover, this usage of IEEs is not in line with the regulation's purpose. The purpose of allowing district-funded IEE's "is to determine whether grounds exist to challenge" the public evaluation. *Warren G*., 190 F.3d at 87. On July 15, 2015, the District mailed Cathy a consent form which would have allowed the District to reevaluate Shane. (Doc. 8-6 at 86–89). Cathy objected to the proposed reevaluation and refused to give her consent. (*Id.* at 87). Thus, the District was never given an opportunity to perform a reevaluation that Cathy might challenge. Allowing the plaintiffs to obtain a District-funded IEE even though Cathy refused to allow consent for a public evaluation would not be in line with the regulation's purpose of allowing parents to challenge a public school's evaluation of the child. The court also finds that the letter relied upon by the plaintiffs supports the District's position and the court will not expand the letter beyond its facts—namely, where a public evaluation has occurred first that is somehow lacking a child may receive *another* private evaluation to challenge the public one. Accordingly, the plaintiffs were not entitled to a

District-funded IEE and the court will affirm the Hearing Officer's decision in this respect.[11]

## V.    CONCLUSION

In accordance with the above, the District's motion for summary judgment/judgment on the administrative record, (Doc. 15), and the plaintiffs' cross-motion for judgment on the administrative record, (Doc. 18), will both be **GRANTED IN PART** and **DENIED IN PART**. The District's motion will be granted and the plaintiffs' motion denied with respect to the Hearing Officer's conclusion that Shane is not entitled to an IEE at public expense. The Hearing Officer's decision on this issue will be affirmed. The District's motion will be denied and the plaintiffs' motion granted, in part, with respect to Officer's Ford's decision that Cathy is not entitled to tuition reimbursement under the IDEA. The Hearing Officer's decision with respect to tuition reimbursement will be reversed and the case remanded for further consideration of the remaining factors in the *Burlington-Carter* test. An appropriate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATED: September 28, 2017**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2016 MEMORANDA\16-0964-01.wpd

---

[11] The court affirms the Hearing Officer's determination on this ground alone and does not reach his determination that a parent is entitled to a district-funded IEE if the district fails, though does not refuse, to evaluate a child. (Doc. 8-2 at 8). The court could not find support for this legal conclusion and need not reach it in light of the facts of this case.